UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                                    :
PATRICK MATHIEU,
                                    :
              Petitioner,                REPORT & RECOMMENDATION
                                    :
         -against-                       05 Civ. 8098 (JSR)(MHD)
                                    :
MICHAEL E. GIAMBRUNO,
Superintendent,                     :
                                    :
              Respondent.           :
-----------------------------------x

**TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:**


        Petitioner Patrick Mathieu seeks a writ of habeas corpus to

challenge his 1997 conviction in New York State Supreme Court, New

York County, on a single count of Burglary in the First Degree. The

trial court sentenced Mathieu to a ten-year term of imprisonment.[1]


        In his habeas petition, Mathieu advances two grounds for

relief. First, he challenges the reliability of the victim's in-

court identification of him. In doing so, he argues that (1) he was

deprived of due process when, during a pre-trial hearing, his

attorney was precluded from probing into whether a suggestive pre-

trial show-up would taint any subsequent in-court identification,

(2) the hearing judge did not properly apply the factors

established in Neil v. Biggers, 409 U.S. 188 (1972), and Manson v.

---

        [1] Petitioner has since been released.

1

Brathwaite, 432 U.S. 98 (1976), in assessing whether there was an independently reliable basis for any in-court identification, and (3) the Appellate Division's decision upholding the hearing court's determination that there was such an independent source was an unreasonable application of clearly established federal law. (Am. Pet. 11-12; Petr.'s Mem. 2-13; Reply 12-17). Second, he complains that he was denied the effective assistance of trial counsel based on his attorney's alleged failure to (1) adequately cross-examine the victim at trial, (2) present exculpatory evidence through two defense witnesses who testified at trial, and (3) call a potential alibi witness. (Am. Pet. 13-14; Petr.'s Mem. 13-17; Reply 17-24).[2]

Respondent maintains that the petition must be dismissed. He asserts that petitioner's claim regarding the in-court identification does not warrant habeas relief since the hearing court considered the appropriate factors and the Appellate Division's conclusion about this question was neither contrary to,

---

[2] Petitioner also argues that he was "severely prejudiced" by his trial counsel's "non-genuine objections." (Reply 17). In addition to never advancing this particular argument in any of the state-court proceedings below, petitioner also did not make this argument in his habeas petition or accompanying memo, asserting it for the first time in his reply brief. It is thus not properly before this court. See, e.g., Evangelista v. Ashcroft, 359 F.3d 145, 156 (2d Cir. 2004) (reiterating that the court "will not consider an argument raised for the first time in a reply brief" (quoting United States v. Yousef, 327 F.3d 56, 115 (2d Cir. 2003))). In any event, we find the argument to be without merit.

nor an unreasonable application of, clearly established federal law. (Opp'n Mem. 36-42). Respondent further argues that petitioner's ineffective-assistance claim fails because it is both unexhausted and procedurally defaulted, and that it is meritless in any event. (Opp'n Mem. 34-35, 43-60). Finally, he asserts that the petition is untimely. (Opp'n Mem. 32-33). For the reasons that follow, we recommend that the writ be denied and the petition dismissed with prejudice.

## PRIOR PROCEEDINGS

The charges against petitioner stemmed from an incident that occurred during the early morning of August 26, 1996. Jacqueline Rosa, who lived in a small carriage house apartment that was behind petitioner's building and shared a courtyard with it, was watering plants outside of her apartment. A man approached her, produced a knife, and forced her inside her apartment and into her bedroom. After hearing an alarm clock sound, he fled. Petitioner was arrested later that night after Rosa identified him, during a show-up in the courtyard, as the intruder.

### A. Indictment and Pre-Trial Hearings

By Indictment Number 7580/96, a New York County grand jury

charged petitioner with Burglary in the First Degree and Attempted Rape in the First Degree. A combined Dunaway, Huntley, Wade hearing, see Dunaway v. New York, 442 U.S. 200 (1979); United States v. Wade, 388 U.S. 218 (1967); People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838 (1965), commenced on January 30, 1997 before Supreme Court Justice Harold Beeler. (Hr'g Tr. 1-2). The purpose of the hearing was to determine (1) whether a statement made by petitioner to police prior to his arrest was voluntary and could be introduced, (2) whether petitioner's participation in the show-up was voluntary and, if not, whether his detention by the police in order to place him in the show-up was reasonable, and (3) whether the show-up was unduly suggestive. (Id. at 88-93). After finding that the show-up was impermissibly suggestive and suppressing Rosa's out-of-court identification (id. at 92-93), the hearing court heard testimony as to whether Rosa's in-court identification of petitioner would be based on a source independent of the suggestive procedure. (Id. at 94-95, 98-99, 143). We summarize the hearing testimony insofar as it is relevant to the show-up and any independent source for Rosa's in-court identification.

Rosa testified that at 5:30 in the morning of August 26, 1996, she was watering plants on the patio in front of her apartment at

4

441 Third Avenue when a man appeared and spoke to her.[3] (Id. at 100-02). The man then approached, put a knife to her throat, and forced her inside her apartment. (Id. at 101-02). Once inside, the man, while facing Rosa, pushed her across the apartment. They collided with a piece of furniture, he fell on top of her, and a struggle for the knife ensued. (Id. at 103-04, 117-18, 120-21). The man then instructed Rosa to go upstairs, pushing her from behind up the staircase to the second floor. (Id. at 119). Upon reaching the second floor landing, Rosa tried to activate a recently installed alarm, but the man pulled her away from the alarm pad and pushed her into her bedroom and onto her bed. (Id. at 120-23). Her alarm clock sounded, and the man, apparently believing that Rosa's home alarm had been activated, fled. (Id. at 124).

According to Rosa, the encounter occurred over a span of five to ten minutes. (Id. at 102). She stated that her apartment was lit

---

[3] The exact words spoken have been disputed throughout the case. At the hearing, Sergeant Kevin Meurer testified that during his investigation on the evening of the incident, Rosa had told him that the man had said to her, "You are new here." (Id. at 14, 34). At the trial, Police Officer Robert Quinn, who had responded to Rosa's 911 call and had interviewed her immediately after the incident, testified that Rosa had reported that the man had said to her, "Don't be nervous. I'm your neighbor. You're new here." (2d Trial Tr. 532, May 5, 1997 [hereinafter "Tr."]). At both the hearing and trial, however, Rosa testified that the man had said that he lived "in the building" and that his name was Patrick. (Hr'g Tr. 114; Tr. 331, 338). Louise Reinhardt, the superintendent of Rosa's and petitioner's buildings (Tr. 324, 436, 446-47), testified at trial that Rosa had told her the same. (Id. at 452).

with both natural and electric light during the incident, and that at no point was anything obstructing her view of her attacker. (Id. at 103-05). She described her assailant as a light-skinned black man with dreadlocks that were at least shoulder-length and "reddish" (id. at 101, 126, 129-31), and estimated that he was between twenty and thirty years old, stood between five feet six and five feet eight inches tall, and weighed between 130 and 150 pounds. (Id. at 101-02, 112-13). She recalled that he was wearing a denim shirt, denim jeans, and brown shoes, and that he did not appear to have any facial hair, scars, or tattoos. (Id. at 113, 125, 132). According to Rosa, the man was approximately three feet away from her when he first appeared on her patio, and his face was four to five inches from her own as he pushed her across the apartment, "close enough that I could smell that there was alcohol on his breath." (Id. at 102; see id. at 103). She also testified that she had a view of his full body while she was in the bedroom. (Id. at 125).

Petitioner's counsel at the hearing, Steven Questore, Esq. of the Legal Aid Society, cross-examined Rosa at length about the encounter. He asked her about her ability to see the intruder, including the lighting conditions, the distance between Rosa and the stranger, and whether Rosa was facing or turned away from him during the incident. (See Hr'g Tr. 111-12, 114, 116-17, 119-22,

124-25). He probed into where Rosa's attention was during the attack and whether she was able to notice identifying characteristics of her attacker. (See id. at 119, 122-23, 125-32). Finally, he questioned her about the descriptions of the intruder that she had given immediately after the incident, including one during a 911 call and another she provided to the police officer who initially responded to the call. (See id. at 134-38).

Police Sergeant Kevin Meurer was the other witness who testified at the pre-trial hearing. He stated that on the evening of August 26, 1996, he had arrived at Rosa's apartment between 9:30 and 10:00 p.m. to assist two other officers who were conducting an investigation of the burglary that had occurred that morning. (Id. at 8-9, 24). Sergeant Meurer described Rosa's apartment as a separate house located behind an apartment building whose address it shared, and he noted that her apartment could only be reached by passing through the building and a courtyard behind it. (Id. at 9-10).

Sergeant Meurer testified that upon his arrival, he spoke with Police Officer Laurie Abagnale, one of the officers conducting the investigation. (Id. at 10-11). He then recounted Officer Abagnale's description of the investigation up to that point. According to Sergeant Meurer, Officer Abagnale reported that Rosa had described

7

the intruder to the police, and Louise Reinhardt, the superintendent of 441 Third Avenue, had heard the description and had stated that it sounded like someone who lived in apartment 2-R of the main building. (Id. at 11, 27, 29). According to Sergeant Meurer, Officer Abagnale reported that she had then gone to apartment 2-R. (Id. at 12, 30). Lillian Landeo opened the door and confirmed that a man lived there, and petitioner came to the door at the officer's request. (Id. at 12, 30-31). When Officer Abagnale asked petitioner where he had been that morning, Landeo stated that he had been with her all night, and petitioner nodded. (Id. at 12, 31).

Sergeant Meurer testified that after receiving this information from Officer Abagnale, he interviewed Rosa, who described the intruder as a black man, about five feet eight inches tall and 150 pounds, with reddish dreadlocks. (Id. at 13-14, 32-33, 36). Rosa also told Sergeant Meurer about the superintendent's statement that the man in apartment 2-R fit the description, and Sergeant Meurer informed her that he would speak with the man. (Id. at 15, 40-43).

According to Sergeant Meurer, he then proceeded to apartment 2-R, accompanied by three other police officers, and Landeo answered the door. (Id. at 15, 45). He told her that there had been

an "incident that happened in the rear apartment the night before," and that the officers wanted to speak with petitioner. (Id. at 15). Petitioner came to the door and answered the officers' questions as to his whereabouts the prior night, stating that he had had a few drinks with Landeo, that they had gone to bed around 11:00 p.m., and that he had left the apartment between 4:00 and 5:00 a.m. to get cigarettes at a nearby deli. (Id. at 16-17, 46). Sergeant Meurer asked petitioner if he would voluntarily "come down to the back and have the complainant take a look at him," and told petitioner that he was free to leave at any time. (Id. at 17; see also id. at 50, 53). According to Sergeant Meurer, he instructed Officer Abagnale to have petitioner sign a statement indicating that petitioner understood he could leave at any time. (Id. at 51-52). Petitioner did so, hesitantly and apprehensively, while the officers accompanied him towards the building's exit. (Id. at 53-54).

As the officers remained with petitioner in a hallway leading to the courtyard, Sergeant Meurer returned to Rosa's apartment and told her that they were going to "bring a gentleman out" to "see if you recognize him from anywhere." (Id. at 19; see also id. at 56). While Rosa remained in her apartment with the lights off, the officers brought petitioner into the courtyard, placed him about fifteen feet from Rosa's front window, and shone a floodlight on

him. (Id. at 19, 57-59). Sergeant Meurer testified that Rosa identified petitioner as the man who had attacked her and that she then ran upstairs and vomited. (Id. at 20). The officers subsequently handcuffed petitioner. (Id.).

Petitioner's counsel also cross-examined Sergeant Meurer. In addition to asking about the circumstances leading up to and surrounding the show-up, counsel inquired about the physical description of the intruder that Rosa had provided to Sergeant Meurer (id. at 36-37), as well as petitioner's physical characteristics at the time. (See id. at 60-62).

After hearing all the testimony, Justice Beeler ruled that there was an independent basis for Rosa's in-court identification of petitioner notwithstanding the suggestiveness of the show-up. (Id. at 93, 150). In making this ruling, the court specifically noted that Rosa had "had a very, very good opportunity to view" petitioner (id. at 149), since she had been "face to face" with him for a "substantial portion" of the incident (id. at 148) and since "[h]er view was for the most part unobstructed." (Id. at 150). More specifically, the court found that Rosa had "five to seven minutes" to see her attacker at "very close proximity, under very good lighting conditions," and that he had "forced her to look directly at him." (Id. at 150). The court also found that Rosa "was able to

describe him in detail" (<u>id.</u> at 149) and that she was "certain
about what she remembered about him." (<u>Id.</u> at 150-51). Finally, the
court noted that the description Rosa gave after the incident was
largely consistent with the description she gave in court (<u>id.</u> at
149), and that petitioner "matches the description." (<u>Id.</u> at 90).


B. <u>Trial Proceedings</u>


The first trial was commenced before Justice Jeffrey Atlas and
a jury in February 1997. (1st Trial Tr. 1, Feb. 5, 1997). Although
the jury reached a unanimous verdict of not guilty on the
attempted-rape charge, it could not reach consensus on the burglary
charge. (Deliberations Tr. 18-20, Feb. 11, 1997). The jury's
partial verdict acquitting petitioner of attempted rape was thus
entered (<u>id.</u> at 17, 20), and a second trial on the remaining
burglary charge was commenced before Justice Jay Gold on May 5,
1997. (Tr. 1). At both trials, Rosa made in-court identifications
of petitioner. (1st Trial Tr. 10; Tr. 334). We briefly summarize
the relevant testimony of the second trial, which resulted in the
conviction now at issue.


Jacqueline Rosa's testimony at trial was similar to her
testimony during the pre-trial hearing. She first described her
apartment, stating that it was located behind an apartment building

11

with the same address, that the patio between the two buildings was accessible to all of the tenants of the main building, and that while two keys were required to enter the main building from Third Avenue, the back door leading from the main building to the patio did not require a key. (Tr. 324-27). Rosa then testified about the incident that occurred on the morning of August 26 (Tr. 331-33, 339-53) and identified petitioner as her attacker. (Tr. 334). She again described petitioner as he had looked on that date as a "light-skinned black man" with long reddish dreadlocks who was wearing a denim shirt and jeans and who appeared to be between the ages of twenty and thirty, between five feet six inches and five feet eight inches tall, and between 130 and 150 pounds. (Tr. 336-37). Rosa also testified that she had provided the same description to the officers who arrived early that morning in response to her 911 call, and substantially the same description to Officers Abagnale and Breslin later that evening. (Tr. 364-66, 368-70). She again stated that nothing had obstructed her view of petitioner and that the lighting conditions had been good. (Tr. 335-36, 350). According to Rosa, the incident lasted between four and eight minutes (Tr. 353), at various points during which the focus of her attention was on petitioner's face. (Tr. 343, 352). Rosa stated that petitioner looked the same at trial as he had on the date of the crime, and when asked whether she was certain that petitioner was the man who had attacked her, she replied, "I am absolutely

12

positive." (Tr. 373).

On cross-examination, petitioner's counsel, Sonia Tate, Esq. of the Legal Aid Society, focused on establishing discrepancies between the statements Rosa had made immediately after the incident and those she made in court. Petitioner's counsel thus questioned Rosa about her descriptions of petitioner's physical appearance, as well as her descriptions of what petitioner had said on the patio, in an apparent attempt to cast doubt on Rosa's version of the events. (See Tr. 412-16, 418-20, 425-26). Petitioner's counsel also elicited testimony about what Rosa had noticed during the incident, including the color and type of shoes petitioner had been wearing and specific details about the knife he had been holding. (See Tr. 420-22).

Louise Reinhardt, the superintendent of 441 Third Avenue, testified about access to Rosa's apartment and the layout and general security of the two buildings at that address. (Tr. 436-43, 447-48, 452-60). She also testified that upon hearing Rosa's description of the intruder to Officer Abagnale, she had told the officer that the description sounded like "the boy" living in apartment 2-R. (Tr. 444, 446, 461). According to Reinhardt, the description Rosa gave to the police fit petitioner "exactly." (Tr. 444).

13

The State's last witness on its direct case was Officer Abagnale, who recounted what had occurred during the police investigation at Rosa's apartment the evening of the incident. She testified that Rosa had described her attacker as a "light skinned black male" who was approximately five feet six inches to five feet eight inches, "a hundred and thirty to forty pounds, late thirties, [with] long dreadlocks that were brown in color with a reddish highlight to them." (Tr. 469-70). Officer Abagnale reported that, according to the information she gathered from petitioner after his arrest, he was five feet six inches tall, 140 pounds, and forty years old on the date of the incident. (Tr. 474). Officer Abagnale also identified petitioner at trial (Tr. 471-72), and stated that he looked the same during the trial as he did on August 26, 1996, except that "his hair look[ed] darker" at the trial. (Tr. 472).

Petitioner called four witnesses: Andrea Carter-Cohen and Jonatha Jones, both tenants in the main apartment building at 441 Third Avenue (Tr. 503-04, 586); Police Officer Robert Quinn, who had responded to Rosa's 911 call immediately after the incident (Tr. 530-32); and Police Detective Louis D'Onofrio, who had two telephone conversations with Rosa on the day of the incident. (Tr. 547-48, 550-51).

Carter-Cohen testified about security problems in the building

14

on or around August 26, 1996. She stated that she had seen non-tenants use keys to enter a locked, gated garbage area that was adjacent to Rosa's patio. (Tr. 513-14, 516).[4] She also testified that the gate to the garbage area[5] had not always been locked during the month of August. (Tr. 517). According to Carter-Cohen, the postman's building key had also been stolen that month. (Tr. 521-22). She attempted to give testimony about the presence of homeless people in the building, but the trial court prevented her from doing so. (Tr. 522-23). Finally, she testified that the outer door of the main building had been unlocked and ajar on the morning of August 26. (Tr. 511-12, 517).

Jones also described security issues in the building. She testified that homeless men who performed odd jobs for the delicatessen next door[6] had been given keys to, and regularly entered, the building (Tr. 589), and that for several years there had been a problem with homeless men sleeping in the building. (Tr.

---

[4] This garbage area was accessible from Third Avenue via a locked gate for which all the tenants had keys. (See, e.g., Tr. 329-30, 438-39, 526-28). It was also accessible from Rosa's patio through a different gate, but the patio could not be reached through that gate from the garbage area if one had not already entered through the patio. (See Tr. 400-01, 440, 515).

[5] The witness was presumably referring to the gate from Third Avenue into the garbage area.

[6] The delicatessen was operated by 441 Third Avenue tenants. (See Tr. 438-39).

15

588). Jones also recalled that on the morning of August 26, the inner door into the main apartment building had been propped open (Tr. 587), and that she had seen "a shadow out of the corner of my eye . . . coming from underneath the stairwell." (Tr. 588).

Officer Quinn recounted the descriptions Rosa had given him about the incident and the intruder when the officer initially responded to the call. Referring to the complaint report he had completed the morning of the incident, Officer Quinn testified that Rosa had described her attacker as an approximately twenty-year-old person who was five feet eight inches tall, weighed 130 pounds, and had brown dreadlocks "with some kind of color in them." (Tr. 538; see Tr. 535-36). Officer Quinn and Officer D'Onofrio both testified that Rosa had reported that the intruder had told her, "Don't be nervous. I am your neighbor. You're new," when he initially appeared. (Tr. 534, 549).

The prosecutor called two rebuttal witnesses, Brenda Lopez and Argnue Kumar, who worked with and were supervised by Rosa. (Tr. 618, 623-24). Rosa had called both women into her office on the morning of August 26, 1996 and had told them about the incident that had occurred. (Tr. 618-19, 624-25). Both witnesses testified that Rosa had said that the intruder had told her that his name was Patrick and that he lived in the building. (Tr. 620, 625).

16

In closing argument, defense counsel stressed the inconsistencies between the descriptions of the intruder that Rosa had given to the various witnesses and to the court, arguing that Rosa's recollection of the incident and her attacker began to change after Reinhardt had suggested that Rosa's description "sounds like the boy in 2-R." (See Tr. 658-63). Counsel also challenged Rosa's claim that the intruder had introduced himself as Patrick and said that he lived in the building. (See Tr. 664-65, 674-75). She focused on the security problems that existed in the main building at the time of the incident and the fact that homeless men had access to the building. (Tr. 678-79). She also stressed the lack of physical evidence linking petitioner to the crime. (Tr. 682-84). Finally, counsel attacked Rosa's ability to identify her attacker, arguing that Rosa's attention was not on her attacker's face and that the incident could not have lasted as long as Rosa claimed that it did. (Tr. 667-73).

In her closing argument, the prosecutor stressed the reliability of Rosa's identification of petitioner and the weakness of the defense's arguments. (Tr. 689-738).

On May 9, 1997, the jury found petitioner guilty of first-degree burglary. (Tr. 641, 763, 765). On May 28, 1997, Justice Gold sentenced petitioner, a second violent felony offender, to a

17

determinate prison term of ten years. (Sentencing Tr. 12, 30).


C. <u>Direct Appeal and Collateral Proceedings</u>


Petitioner appeared to the Appellate Division, First Department. His attorney raised three grounds: (1) that petitioner had been denied the right to a fair trial because the trial court had excluded expert testimony on cross-racial identification; (2) that petitioner had been denied a fair trial because the prosecutor during summation had suggested that petitioner had an intent to rape; and (3) that the prosecution had failed to prove guilt beyond a reasonable doubt and that the verdict was against the weight of evidence. (Respt.'s Ex. A at 5). Additionally, in a supplemental <u>pro</u> <u>se</u> brief, petitioner argued that (1) the hearing court had erred by not permitting defense counsel to question Rosa on the potential impact of the show-up on her subsequent in-court identification of petitioner, and (2) he had been denied the effective assistance of trial counsel. (Respt.'s Ex. C at v). Petitioner based his ineffective-assistance claim on a variety of alleged errors by trial counsel: (a) failing to act during voir dire after a potential juror, who was excluded from the jury, made an allegedly prejudicial remark (<u>see</u> <u>id.</u> at 9-10); (b) failing to call Sergeant Meurer as a witness at trial (<u>see</u> <u>id.</u> at 17-19); (c) failing to adequately attack Reinhardt's and Officer Abagnale's

18

veracity during cross-examination (see id. at 13-26); (d) shifting the defense theory during summation from misidentification to conspiracy (see id. at 26-30); (e) failing to object to various statements by the prosecutor during summation, the effect of which was to shift the burden of proof from the prosecution to the defense (see id. at 30-35); and (f) failing to object to the trial court's instructions. (See id. at 37-44).

The Appellate Division affirmed. In addition to addressing and rejecting the grounds raised by petitioner's appellate counsel, the court addressed the claims raised in petitioner's pro se brief, holding that there was "no basis upon which to disturb the jury's determinations concerning identification" and further stating:

> Although the hearing court should have permitted defense counsel to question the complainant concerning the possible impact of the improper showup on any in-court identification, the record establishes that such evidence was before the court, which then weighed the appropriate factors in determining whether an independent source existed for the complainant's in-court identification against the suggestive effect of the invalid identification procedure. The record supports the court's conclusion that clear and convincing evidence existed for such a finding of independent source.

People v. Mathien,[7] 276 A.D.2d 302, 303, 714 N.Y.S.2d 28, 29 (1st Dep't 2000). The court also held that because petitioner's "ineffective assistance claim rests largely on facts dehors the

---

[7] Petitioner was referred to as "Patrick Mathien, also known as Patrick Mathieu" in many of the post-conviction proceedings in the state courts.

record and matters of strategy of a type requiring explanation, it would require a CPL 440.10[8] motion," but that "[t]o the extent the present record permits review, we find that defendant received meaningful representation." Id.

Petitioner subsequently filed an application for leave to appeal to the New York Court of Appeals, which was denied on January 22, 2001. People v. Mathien, 96 N.Y.2d 736, 722 N.Y.S.2d 803 (2001). Upon reconsideration, on April 6, 2001, the New York Court of Appeals again denied leave. People v. Mathien, 96 N.Y.2d 802, 726 N.Y.S.2d 380 (2001).

On August 13, 2001, petitioner filed a motion for a writ of error coram nobis, contending that his appellate counsel, Frederica L. Miller, Esq., was also ineffective. In his 113-page affidavit, petitioner argued in substance that (1) appellate counsel did not adequately argue the three grounds she had raised on appeal because she did not sufficiently review the trial transcripts and did not present the issues by way of the most effective legal theories, and (2) she should have presented the arguments that petitioner raised in his pro se supplemental brief, namely, that trial counsel's assistance was ineffective and that petitioner's due-process rights had been violated during the pre-trial hearing.  Petitioner focused

---

[8] See N.Y. Crim. Proc. Law § 440.10.

20

in particular on his appellate counsel's alleged failure to discuss what he claimed were apparent contradictions and falsehoods in the trial witnesses' testimony, which he repeatedly argued showed "that the evidence was legally insufficient and the verdict was against the weight of the evidence." (Petr.'s Error Coram Nobis Aff. 60; see also id. at 90, 97).

The Appellate Division denied petitioner's motion on August 1, 2002. People v. Mathien, 297 A.D.2d 467, 746 N.Y.S.2d 621 (1st Dep't 2002). On October 29, 2002, the New York Court of Appeals denied petitioner's application for leave to appeal the denial. People v. Mathien, 98 N.Y.2d 769, 752 N.Y.S.2d 10 (2002).[9]

On April 1, 2003, petitioner, through his current counsel, filed a motion to vacate the judgment pursuant to section 440.10 of the New York Criminal Procedure Law ("CPL"), alleging ineffective assistance of counsel. (Respt.'s Exs. H, I). The "central basis" for the motion was  trial counsel's alleged failure to present certain exculpatory evidence. (Respt.'s Ex. H, Affirmation of

---

[9] At the time, the New York Court of Appeals did not have authority to review the Appellate Division's denials of coram nobis applications. See, e.g., Hizbullahankhamon v. Walker, 255 F.3d 65, 70-72 (2d Cir. 2001). As respondent notes, the New York Criminal Procedure Law has since been amended. See 2002 N.Y. Laws ch. 498 (effective Nov. 1, 2002) (amending N.Y. Crim. Proc. L. § 450.90); see also People v. Stultz, 2 N.Y.3d 277, 281, 778 N.Y.S.2d 431, 433 (2004).

Camille M. Abate, Esq., executed Mar. 28, 2003, at 9).
Specifically, petitioner contended that trial counsel should have
elicited, through the testimony of Andrea Carter-Cohen and Jonatha
Jones, physical descriptions of the two homeless men seen in and
around the apartment buildings prior to the incident,[10] and should
have called Lillian Landeo, petitioner's girlfriend, as an alibi
witness. (Id. at 9-10). Petitioner also attacked his trial
counsel's cross-examination of Rosa, claiming that counsel failed
to impeach Rosa on her physical descriptions of her attacker, the
duration of the incident, the lighting conditions, and whether and
when she activated her house alarm. (Id. at 14-16, 18-23).

    The District Attorney opposed the motion, arguing that defense
counsel had presented a strong misidentification defense and citing
numerous examples of counsel's efforts toward that end. (See
Respt.'s Ex. J). The opposition papers included an affirmation by
Joyce D. Kendrick, Esq., one of petitioner's attorneys at the
second trial, who discussed the defense strategy and the trial
preparation she and her co-counsel had undertaken. (See Respt.'s
Ex. K). Addressing petitioner's specific complaints, the District
Attorney noted that defense counsel had repeatedly attempted to
introduce more evidence about the homeless men but were barred from

---

[10] The homeless men reportedly also were black and had
dreadlocks. (Id.)

doing so by the trial court. (Id. at 6, 10). He also contended, based in part on the Kendrick affirmation, that defense counsel had many reasons not to call Landeo as an alibi witness, including the concern that she would be impeached for bias, that she would open the door to the admission of an incriminating statement made by petitioner, and that she could not withstand cross-examination. (See id. at 10-13). Finally, the District Attorney argued that, contrary to petitioner's characterizations, defense counsel's cross-examination of Rosa had indeed focused on raising doubts about Rosa's perception of the events and her ability to identify her assailant. (Id. at 4-5).

In an opinion filed on February 11, 2004, Justice Bruce Allen denied petitioner's 440.10 motion. (Respt.'s Ex. M). The court addressed each of petitioner's arguments, concluding that petitioner's claims were "clearly insufficient to establish ineffective assistance." (Id. at 2). The court noted that trial counsel had attempted to question Jones and Carter-Cohen about the homeless men's physical appearances but could not because the prosecutor's objections to the questions were sustained, and that the significance of such testimony was questionable in any event, since the witnesses would "only have testified that within the general time frame, but not on the date of the crime, they had observed men who shared two relatively common features with

defendant, that is, they were black and had dre[a]dlocks." (<u>Id.</u> at 4). The court also found that trial counsel had legitimate reasons for not calling Lillian Landeo as a witness, since counsel had found her "defensive and easily confused" during preparation and since it was possible that petitioner's statement to the police about leaving the apartment to buy cigarettes around the time of the incident could have been admitted during a cross-examination of Landeo. (<u>Id.</u> at 6).[11] Finally, the court stated that challenging certain portions of Rosa's testimony through cross-examination "could have been perceived as an unfair attack on the victim of a crime . . . and thus have antagonized the jury" and that "there were obvious reasons not to vigorously cross-examine the complainant with regard to points which were brought out through other witnesses." (<u>Id.</u> at 3).

Petitioner timely moved for, and was granted, leave to appeal

---

[11] The statement had been ruled inadmissible on the prosecution's direct case because the prosecutor had not provided notice of intent to use the statement, as required by New York's Criminal Procedure Law. (Tr. 569-72). <u>See</u> N.Y. Crim. Proc. Law § 710.30; <u>see also</u> <u>People v. Briggs</u>, 38 N.Y.2d 319, 322, 379 N.Y.S.2d 779, 781-82 (1975). However, lack of notice does not preclude use of such a statement during cross-examination of a third-party witness when defense counsel opens the door to its admission. <u>See, e.g.</u>, <u>People v. Goodson</u>, 57 N.Y.2d 828, 830, 455 N.Y.S.2d 757, 758 (1982); <u>People v. Acosta</u>, 180 A.D.2d 505, 509, 580 N.Y.S.2d 927, 930 (1st Dep't 1992). Defense counsel sought a ruling from the trial court that petitioner's statement could not be admitted via Landeo's testimony (<u>see</u> Tr. 500-01, 571), but the court declined to make a ruling prior to Landeo being called as a witness. (<u>Id.</u> at 598-99).

to the Appellate Division from the denial of his 440.10 motion. (Respt.'s Exs. N, P). On appeal, petitioner, in addition to arguing that the trial court should have held a hearing on the 440.10 motion, contended that the court had erred in finding no ineffective assistance based on trial counsel's not having elicited the descriptions of the homeless men, not having presented certain evidence related to Rosa's home alarm system, and not having called Lillian Landeo as an alibi witness. (Respt.'s Ex. Q at 22-38).

On June 16, 2005, the Appellate Division affirmed the denial of petitioner's 440.10 motion, holding that the lower court, "which made detailed findings that are supported by the record, properly denied defendant's motion to vacate judgment." People v. Mathieu, 19 A.D.3d 219, 219, 796 N.Y.S.2d 522, 523 (1st Dep't 2005). Applying both federal and state law, the Appellate Division found that the "submissions on the motion, taken together with the trial record, establish that defendant received effective assistance of counsel." Id. The court further stated:

> Even if we were to conclude that trial counsel should have introduced additional evidence in support of a theory of third-party culpability, we would find that the omitted evidence was exceedingly weak, and that its absence did not prejudice defendant's defense or deprive him of a fair trial. The remaining acts of counsel challenged by defendant on appeal were reasonable strategic choices, and were we to find otherwise, we would find that they did not cause defendant any prejudice.

Id. at 219-20; 796 N.Y.S.2d at 523 (citations omitted).

25

Petitioner did not seek leave to appeal to the New York Court of Appeals. On September 19, 2005, he filed his current application for a federal writ of habeas corpus.

ANALYSIS

I. Timeliness and Exhaustion

We begin by addressing respondent's contentions that petitioner failed to file a timely application and failed to exhaust all of his claims, since such omissions would permit dismissal without a review of the merits.

A. Statute of Limitations

The federal habeas statute was amended, effective April 24, 1996, by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). Among the changes wrought by AEDPA was the enactment of a one-year statute of limitations for the filing of habeas petitions, which begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1). The statute also contains a tolling provision specifying that "the time during which a properly

26

filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

As noted, petitioner's conviction was affirmed by the Appellate Division, People v. Mathien, 276 A.D.2d at 303, 714 N.Y.S.2d at 29, and the New York Court of Appeals denied leave to appeal. People v. Mathien, 96 N.Y.2d at 802, 726 N.Y.S.2d at 380. Petitioner's conviction became final ninety days thereafter, on July 5, 2001, since petitioner did not petition for a writ of certiorari from the United States Supreme Court. See Fernandez v. Artuz, 402 F.3d 111, 112 (2d Cir. 2005).[12] The AEDPA limitations period thus began to run on July 5, 2001. See § 2244(d)(1).

The limitations period was tolled thirty-nine days later, on August 13, 2001, when petitioner filed his motion for a writ of error coram nobis. See § 2244(d)(2); Clark v. Stinson, 214 F.3d 315, 319 (2d Cir. 2000). The limitations period began running again on August 1, 2002, the date the Appellate Division denied the motion. See Hizbullahankhamon, 255 F.3d at 70-72 (2d Cir. 2001); see also Geraci v. Senkowski, 211 F.3d 6, 9 (2d Cir. 2000); People

---

[12] The Supreme Court's recent decision in Lawrence v. Florida, 127 S. Ct. 1079 (2007), does not alter this rule. See id. at 1083-84.

v. DeLeon, 83 N.Y.2d 779, 611 N.Y.S.2d 126 (1994).[13] Although petitioner contends that the AEDPA limitations period was tolled until the date he was served with notice of the Appellate Division's denial, it is the date the denial is filed, and not the date petitioner receives notice of the denial, that triggers the renewed running of the AEDPA clock. See Geraci, 211 F.3d at 9.[14]

On April 1, 2003, petitioner filed his CPL § 440.10 motion, and the limitations period was again tolled. See § 2244(d)(2); see also, e.g., Purdy v. Bennett, 214 F. Supp. 2d 348, 354-55 (S.D.N.Y. 2002). Between August 1, 2002 and April 1, 2003, 243 days had passed. On June 21, 2005, petitioner was served, via his counsel, with the order of the Appellate Division affirming the trial

---

[13] Petitioner's application to the New York Court of Appeals did not toll the limitations period because, as noted, that court did not entertain such appeals at the time. See Hizbullahankhamon, 255 F.3d at 70-72; see also supra note 9.

[14] Petitioner cites Bennet v. Artuz, 199 F.3d 116, 120 (2d Cir. 1999), in support of his position. Bennet is distinguishable, however, because the case involved the denial of a CPL § 440.10 motion for which appellate review was available, provided that the defendant requested leave to appeal within thirty days of service of the order of denial. Id. at 120. Because service of the denial order was necessary to commence the thirty-day time period to take an appeal, see, e.g., People v. Washington, 86 N.Y.2d 853, 854, 633 N.Y.S.2d 476, 477 (1995), and the defendant in Bennet had never been served with the order, the court held that the time period to take an appeal had not yet commenced and the 440.10 motion was thus still pending. Bennet, 199 F.3d at 120. Here, because petitioner had no right of appeal from the denial of his coram nobis motion, the rule established in Bennet does not apply.

court's denial of his 440.10 motion. (Decl. of Camille M. Abate, Esq., executed Oct. 17, 2005, at ¶ 9 & Ex. D). He had thirty days within which to appeal the Appellate Division's decision to the Court of Appeals, <u>see</u> N.Y. Crim. Proc. L. §§ 450.90(1), 460.10(5)(a); <u>see also</u> § 450.15(1), and because he did not seek leave to appeal the appellate court's order, AEDPA tolling ended upon expiration of the thirty-day period. <u>See, e.g.</u>, <u>King v. Cunningham</u>, 442 F. Supp. 2d 171, 180 (S.D.N.Y. 2006). The AEDPA limitations period thus began running again on July 20, 2005.

Sixty-one days passed between July 20 and September 19, 2005, when petitioner filed his habeas petition in this court. At the time of filing, the limitations period had run for a total of 343 days. The current petition is therefore timely.

B. <u>Exhaustion</u>

A federal court cannot grant a writ of habeas corpus unless a petitioner has exhausted the remedies available to him in the state courts. 28 U.S.C. § 2254(b)(1)(A); <u>see, e.g.</u>, <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971). Respondent concedes that petitioner has exhausted his remedies as to his identification claim, but argues that petitioner's ineffective-assistance claim is unexhausted (<u>see</u> Opp'n Mem. 34-35), which would render petitioner's application a

"mixed petition" subject to dismissal. <u>Rose v. Lundy</u>, 455 U.S. 509, 510 (1982). Under AEDPA, however, courts may deny such a petition on the merits notwithstanding the failure to exhaust. <u>See</u> § 2254(b)(2); <u>Duncan v. Walker</u>, 533 U.S. 167, 191 (2001) (observing that "the prisoner who chooses to go into federal court with unexhausted claims runs the risk that the district court will simply deny those claims on the merits, as it is permitted to do"); <u>Greiner v. Wells</u>, 417 F.3d 305, 317-18 n.14 (2d Cir. 2005); <u>Pratt v. Greiner</u>, 306 F.3d 1190, 1197 (2d Cir. 2002) ("A district court also may, as the court below apparently did, deny a petition on the merits even if it contains an unexhausted claim."); <u>King v. Cunningham</u>, 442 F. Supp. 2d 171, 182 (S.D.N.Y. 2006) ("In the interest of addressing the merits issues of King's procedurally complex petition, this Court will invoke its statutory discretion and deny King's claims on the merits despite his failure to exhaust state remedies."). Since petitioner's current claims are clearly without merit, we bypass the exhaustion question and instead recommend that petitioner's claims be denied on the merits.

### III. <u>The Identification Claim</u>

Petitioner first claims that the Appellate Division erred in upholding the hearing court's determination that an independent basis existed for Rosa's in-court identification of petitioner.

Respondent argues that the Appellate Division's determination was neither contrary to, nor an unreasonable application of, clearly established federal law. We agree.


A.   <u>The AEDPA Inquiry</u>


Under AEDPA, where a state court has addressed a habeas petitioner's claims on the merits, the petitioner must meet a stringent standard before a federal court can issue the writ. Specifically, habeas relief may be granted only when the state court's decision

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). <u>See, e.g.</u>, <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240, 265-66 (2005); <u>Williams v. Taylor</u>, 529 U.S. 362, 375-90 (2000).


Here, there is no dispute that the Appellate Division reached the merits of petitioner's claim. After determining that the hearing court had "weighed the appropriate factors in determining whether an independent source existed for the complainant's in-court identification against the suggestive effect of the invalid

31

identification procedure," the Appellate Division agreed with the hearing court's conclusion that "clear and convincing evidence existed for such a finding of independent source." Mathien, 276 A.D.2d at 303, 714 N.Y.S.2d at 29. We now turn to whether the appellate court's rulings were contrary to, or an unreasonable application of, Supreme Court law or were based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d).

B. Standard of Review

While a suggestive pre-trial identification procedure "does not in itself intrude upon a constitutionally protected interest," Manson v. Brathwaite, 432 U.S. 98, 113 n.13 (1977), a defendant's right to due process includes the right not to be the object of "irreparable misidentification" at trial. Simmons v. United States, 390 U.S. 377, 384 (1968); see Neil v. Biggers, 409 U.S. 188, 198 (1972); Dunnigan v. Keane, 137 F.3d 117, 128 (2d Cir. 1998). Courts thus undertake a two-part inquiry to determine the constitutionality of the admission of a witness's in-court identification of a defendant. First, the court must examine "whether the circumstances surrounding the witness'[s] pre-court identification were unduly suggestive of the suspect's guilt." Styers v. Smith, 659 F.2d 293, 297 (2d Cir. 1981). If the

32

identification procedures were unduly suggestive, then the court must assess whether "a threshold level of reliability can be established through evidence that is independent of the suggestive procedure." Dunnigan, 137 F.3d at 128. As "reliability is the linchpin in determining the admissibility of identification testimony," Brathwaite, 432 U.S. at 114, "[e]ven grossly suggestive procedures will not require suppression of a witness'[s] identification testimony if it is clearly reliable, independent of improper procedures." Styers, 659 F.2d at 297.

The factors to be considered in evaluating the reliability of identification testimony include "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Brathwaite, 432 U.S. at 114; see Biggers, 409 U.S. at 199-200. It is the role of the fact-finder to assess the reliability of evidence, see, e.g., Watkins v. Sowders, 449 U.S. 341, 347 (1981), and thus absent "a very substantial likelihood of irreparable misidentification," Brathwaite, 432 U.S. at 116 (quoting Simmons, 390 U.S. at 384), "the presence of some element of untrustworthiness goes only to the identification's weight, not to its admissibility." Dunnigan, 137 F.3d at 128.

33

C. <u>The Merits</u>

The hearing court found, and respondent does not dispute, that the courtyard show-up was impermissibly suggestive, and evidence related to that pre-trial identification of petitioner by Rosa was suppressed. We accordingly focus our analysis on Rosa's in-court identification of petitioner, and whether the Appellate Division, in upholding the hearing court's determination that such an identification would have an independently reliable basis, rendered a decision that was contrary to or an unreasonable application of <u>Biggers</u> and its progeny. Consideration of the relevant factors leads us to conclude that Rosa's in-court identification of petitioner was sufficiently reliable to be admitted, despite the suggestiveness of the show-up. Necessarily, then, the Appellate Division's ruling did not contradict or unreasonably apply the relevant Supreme Court precedent.

First, Rosa had ample opportunity to view the perpetrator during the crime. The incident lasted between five and ten minutes, during which time Rosa viewed her attacker head-to-toe from a few feet away as well as face-to-face at very close proximity. Her apartment was well-lit with both natural and artificial light and her view was at no time obstructed. While petitioner argues that Rosa exaggerated the duration of the incident (<u>see</u> Petr.'s Mem. 9-

34

11), even fleeting observations have been held to produce reliable identifications. See, e.g., Gonzalez v. Hammock, 639 F.2d 844, 847 (2d Cir. 1980) ("A mere glance would be sufficient for identification."); United States ex rel. Phipps v. Follette, 428 F.2d 912, 916 (2d Cir. 1970) (noting that twenty to thirty seconds was enough time for the perpetrator's image "to become indelibly seared" in the witness's memory).

Second, as the victim of the crime, Rosa "was not a casual or inattentive observer," Dunnigan, 137 F.3d at 129; see Biggers, 409 U.S. at 200, and her descriptions reveal a high degree of attentiveness throughout the incident. In addition to giving a detailed account of the incident, she provided descriptions of the burglar's physical appearance that included his race, height, build, weight, approximate age, complexion, the color and style of his hair, the clothing he wore, and even the alcohol smell on his breath. Although petitioner suggests that Rosa's descriptions were flawed because she could not recall certain details of her attacker's facial features, such as eye color, facial hair, or the shape of his nose (see Petr.'s Mem. 11-13), this argument is meritless. There is no question that Rosa's description of petitioner "was more than ordinarily thorough," Biggers, 409 U.S. at 200, and we are unaware of any requirement that a witness must describe an attacker's type of nose or lips in order for the

witness's testimony to be considered reliable.

Third, Rosa's descriptions were consistent with petitioner's appearance. She described her attacker as a light-skinned black male with dreadlocks who was in his twenties or thirties, was between five feet six inches and five feet eight inches tall, and weighed between 130 and 150 pounds. She also described the dreadlocks as shoulder-length and "reddish." According to the evidence presented at the hearing and trial, petitioner fit this description, except that he was forty years old at the time of the incident. (See Hr'g Tr. 61-62; Tr. 474; see also Tr. 472).

Petitioner challenges Rosa's descriptions, pointing to discrepancies between them and arguing that Rosa described petitioner using ranges of height, weight, and age in order to better match her description to his actual appearance. We first note that the contention that Rosa modified her in-court descriptions to fit petitioner's appearance is contradicted by the testimony of the officers who had spoken with Rosa at various times prior to the show-up. Officer Quinn testified that Rosa had described her attacker as twenty years old, five feet eight inches tall, and weighing 130 pounds. Officer Meurer testified that Rosa had stated that the attacker was five feet eight inches and 150 pounds. Officer Abagnale testified that Rosa had described her

attacker as five feet six to five feet eight inches tall, between 130 to 140 pounds, and in his late thirties. While there are some variations in these descriptions, the variations are not great and the descriptions are consistent both with Rosa's in-court descriptions of petitioner and, apparently, with petitioner's appearance.

Moreover, in Dunnigan v. Keane, 137 F.3d 117 (2d Cir. 1998), the Second Circuit found nearly identical discrepancies between a witness's description and a defendant's actual appearance –- two inches in height, ten years in age, and thirty pounds -- to be insubstantial. See 137 F.3d at 130. Thus, notwithstanding such discrepancies, and the "highly suggestive" nature of the pre-trial identification procedures, the Dunnigan court held that the admission of the witness's in-court identification of the defendant did not violate due process. Id. at 129-30. As the Second Circuit noted, such discrepancies go to "the weight of the identification, not to its admissibility." Id. at 130.

As for the fourth Biggers factor, the level of certainty demonstrated at the identification, Rosa confidently and unhesitatingly identified petitioner during both trials, as well as at the pre-trial confrontation. Petitioner speculates that Rosa could not have seen his physical characteristics well enough during

37

the show-up to be able to identify him (see Petr.'s Mem. 11-13), but there is no evidence supporting this bare speculation. Indeed, Rosa had a visceral reaction upon seeing petitioner in the courtyard on the night of the incident: as Sergeant Meurer testified at the Wade hearing, she vomited after identifying him as her attacker. (Hr'g Tr. 20). In any event, since what is at issue is the admissibility of the in-court identification as based on Rosa's observation of petitioner during the assault, petitioner's argument is inapposite.

Finally, the length of time between the crime and Rosa's identifications was not so great as to make it likely that she had forgotten what her attacker looked like. Rosa identified petitioner at the first trial, approximately five months after the crime had occurred. Although it had been slightly more than eight months since the crime when Rosa identified petitioner at the second trial, identifications made after far greater intervals have been found reliable, particularly where, as here, there were other strong indicia of reliability. See United States v. Kwong, 69 F.3d 663, 666 (2d Cir. 1995) (finding an identification made five years after the crime reliable); United States v. Tortora, 30 F.3d 334, 338-39 (2d Cir. 1994) (same); United States v. Jacobowitz, 877 F.2d 162, 168 (2d Cir. 1989) (finding an identification made ten months after the crime reliable); United States v. Williams, 596 F.2d 44,

49 (2d Cir. 1979) (finding an identification made thirty-two months after the crime reliable).

In sum, the evidence supported the hearing court's ruling that Rosa's identification of petitioner would be sufficiently reliable despite the suggestiveness of the show-up. Hence it was not error for the Appellate Division to uphold that ruling.

Petitioner cites <u>Gilbert v. California</u>, 388 U.S. 263 (1967), in arguing that the hearing court was required to allow defense counsel to question Rosa specifically about whether the show-up would taint any subsequent in-court identification. (<u>See</u> Petr.'s Mem. 6-7). Petitioner misconstrues the applicable rule.[15] Contrary to petitioner's suggestion, questioning the witness directly about potential taint is not requisite to the admission of in-court identifications under <u>Gilbert</u>. Rather, <u>Gilbert</u> is part of a line of

---

[15] By selectively quoting from <u>Gilbert</u>, petitioner misstates the law. (<u>See</u> Petr.'s Mem. 6). The <u>Gilbert</u> Court, quoted here in full, states: "The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup *but were of independent origin* was constitutional error." <u>Gilbert</u>, 388 U.S. at 272 (emphasis added). The Court went on to explain that because the record did "not permit an informed judgment whether the in-court identifications at the two stages of the trial had an independent source," it was remanding the case to the state supreme court to either "afford the State the opportunity to establish that the in-court identifications had an independent source" or deem the admission of the identifications harmless error. <u>Id.</u> As the quoted text indicates, the focus of the decision was on whether there had been an independent source for the identifications.

cases articulating the more general principle -- which was further clarified in <u>Biggers</u> and <u>Brathwaite</u> -- that identification testimony should not be admitted "unless that evidence has aspects of reliability." <u>Brathwaite</u>, 432 U.S. at 412.

Here, the hearing court allowed defense counsel to inquire into the circumstances surrounding the incident -- including its duration, the lighting conditions, what Rosa saw, whether she could describe her perpetrator, and the accuracy of her descriptions (<u>see</u> Hr'g Tr. 95-96) -- all of which go to the first three <u>Biggers</u> factors for determining the reliability of Rosa's identification.[16] Petitioner takes issue with the hearing court having required defense counsel to focus on Rosa's perceptions "pre-dat[ing] the suggestive procedure" (<u>id.</u> at 99) in order to determine whether an independent source existed for her identification. (<u>See</u> <u>id.</u> at 98-99). But because the hearing court had determined that the show-up was suggestive and ruled that all evidence related to it be excluded, it was proper for the court to focus on Rosa's perceptions and descriptions prior to the show-up to assess whether her identification would be independently reliable, that is, based

_____

[16] Because the last two <u>Biggers</u> factors -- the certainty demonstrated at the confrontation and the time between the crime and the confrontation -- relate to the identification sought to be admitted, and because the court was determining the admissibility of an in-court identification, these two factors were appropriately not analyzed in the context of the show-up.

on a source other than the show-up. Cf. Kwong, 69 F.3d at 666
(observing that determining whether an "in-court identification was
so tainted by the pretrial procedures as to be unreliable . . .
distils to an inquiry into whether the in-court identification was
independently reliable"). Here, and as discussed at length above,
the record indicates that ample evidence was before the hearing
court to allow it to determine that Rosa's in-court identification
would be reliable, as required under Supreme Court law.

Moreover, the fact that the hearing court judge used the
standard set forth in People v. Adams, 53 N.Y.2d 241, 440 N.Y.S.2d
902 (1981), instead of explicitly relying on the factors delineated
in Biggers and Brathwaite, does not change our analysis. (See Hr'g
Tr. 95-96). The Adams standard actually offers more protection to
criminal defendants, since it requires pre-trial identifications to
be excluded if unduly suggestive procedures were used, regardless
of whether the identifications may be independently reliable. 53
N.Y.2d at 249-52, 440 N.Y.S.2d at 906-07. As for in-court
identifications after evidence of a suggestive show-up has been
excluded, Adams is consistent with federal law: "The witness would
still be permitted to identify the defendant in court if that
identification is based on an independent source." Id. at 251, 440
N.Y.S.2d at 907. Indeed, once the trial court had ruled the show-up
unduly suggestive, defense counsel used the Biggers framework in

41

probing whether Rosa could make a reliable in-court identification. (See Hr'g Tr. 111-12, 114, 116-17, 119-23, 125-32, 134-38).[17] Thus, although the hearing court explicitly relied on Adams, the Appellate Division properly concluded that the hearing court had had the necessary evidence before it and had weighed the appropriate factors in determining that an independent source existed for Rosa's in-court identification. Mathien, 276 A.D.2d at 303, 714 N.Y.S.2d at 29.[18]

In short, we find no reason to grant petitioner habeas relief on this claim.

IV. The Ineffective-Assistance Claim

Petitioner claims that his trial attorneys, Sonia Tate, Esq. and Joyce Kendrick, Esq. of the Legal Aid Society, rendered ineffective assistance by not presenting certain potentially exculpatory evidence and by not adequately impeaching the

---

[17] We note that defense counsel further explored the reliability of Rosa's identification of petitioner during witness examination and summations at both trials. (See, e.g., 1st Trial Tr. 65-68, 115, 133, 248, 253-54, 280-81; 1st Trial Summations Tr. 4, 25-27; Tr. 412-16, 469-70, 535-38, 656, 658-63, 666-70, 680).

[18] While petitioner claims that the hearing court relied only on Rosa's opportunity to view, it is clear from the record that the hearing court also focused on Rosa's degree of attention and the accuracy of her descriptions. (See Hr'g Tr. 149-51).

complaining witness during cross-examination. Respondent argues that petitioner's ineffective-assistance claim is unexhausted because petitioner failed to fairly present it to the New York Court of Appeals. (Opp'n Mem. 34-35). Respondent also argues that the claim is procedurally defaulted because petitioner "may no longer have a state court remedy by which to exhaust" the claim. (Opp'n Mem. 43). For the reasons that follow, we find that petitioner's ineffective-assistance claim is so plainly meritless that we need not address the exhaustion or procedural default issues. See, e.g., Greiner, 417 F.3d at 317-18 n.14.

To sustain a claim of ineffective assistance of counsel, a petitioner must show that his lawyer's performance was so deficient "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that his lawyer's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668, 687 (1984). As the Strickland Court further explained, the first prong -- deficient performance -- is satisfied when the petitioner has identified acts or omissions by his counsel that "were outside the wide range of professionally competent assistance." Id. at 690. The second prong -- prejudice -- is satisfied when the petitioner has shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." Id. at 694;
accord, e.g., Henry v. Poole, 409 F.3d 48, 62-64 (2d Cir. 2005).

It bears emphasis that the Strickland standard is "highly
deferential," Kimmelman v. Morrison, 477 U.S. 365, 381 (1986), and
"counsel is strongly presumed to have rendered adequate assistance
and made all significant decisions in the exercise of reasonable
professional judgment." Strickland, 466 U.S. at 690. Thus, a claim
of "constitutional dimension does not arise unless a lawyer's error
is so egregious as to amount to a failure to provide minimal
professional representation." Leslie v. Artuz, 72 F. Supp. 2d 267,
282 (S.D.N.Y. 1999) (quoting Roberts v. Scully, 875 F. Supp. 182,
195 (S.D.N.Y. 1993)), aff'd, 230 F.3d 25 (2d Cir. 2000); see United
States v. Nersesian, 824 F.2d 1294, 1320-22 (2d Cir. 1987).

The burden of proving prejudice is equally onerous. As noted,
the petitioner must demonstrate "a reasonable probability" that the
result of the proceeding would have been different if not for
counsel's deficient performance. "A reasonable probability is one
sufficient to undermine confidence in the outcome of the trial or
appeal." Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001).

Finally, "there is no reason for a court deciding an
ineffective assistance claim . . . to address both components of

the inquiry if the defendant makes an insufficient showing on one."
Strickland, 466 U.S. at 697. That is plainly the case here.

Petitioner first contends that his counsel was ineffective
because she did not adequately impeach Rosa during cross-
examination. It is well-established that courts will not review
counsel's conduct of cross-examination "unless there is no
strategic or tactical justification for the course taken." United
States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998); see also
Garcia v. Kuhlmann, 897 F. Supp. 728, 730 (S.D.N.Y. 1995) ("The
choice of how to conduct cross-examination is a matter of trial
strategy, which will not be reviewed by the Court unless counsel
failed even to put on a defense, or to perform other basic elements
of trial advocacy."); see generally Nersesian, 824 F.2d at 1320-21.

As was noted by the trial court in its ruling on petitioner's
440.10 motion, there were clear reasons not to vigorously cross-
examine Rosa on matters that would be perceived by the jury as
unnecessary attacks on the victim or that were introduced through
other testimony. (See Respt.'s Ex. M at 3). Moreover, the record
shows that defense counsel did cross-examine Rosa on points that
cast doubt on her perceptions of the incident and her ability to
identify petitioner. For example, counsel highlighted discrepancies
in Rosa's descriptions of petitioner (Tr. 412-415), elicited

testimony suggesting that Rosa's attention was not focused on petitioner's face or features during the encounter (Tr. 409, 421-22), and established that Rosa had not told the police that the attacker had said his name was Patrick or that he lived in the building. (Tr. 418-20). The record also indicates that counsel vigorously attacked Rosa's credibility throughout the trial. (See, e.g., Tr. 505, 535-37, 549, 656, 658-60, 664-75, 679-80). While petitioner, with the benefit of hindsight, may now perceive flaws in his counsel's cross-examination of Rosa, it undoubtedly fell well "within the wide range of reasonable professional representation," Nersesian, 824 F.2d at 1321, and thus cannot support a finding of ineffective assistance. See Strickland, 466 U.S. at 689; Loving v. O'Keefe, 960 F. Supp. 46, 51 (S.D.N.Y. 1997).

Petitioner also complains that his counsel rendered ineffective assistance because she did not elicit physical descriptions of the homeless men during her direct examination of Jones and Carter-Cohen. It is clear from the record, however, that counsel presented as much information about the homeless men as she was permitted to by the trial court, which repeatedly blocked counsel's attempts to elicit more specific descriptions of the men.

46

(Tr. 492, 516, 520, 523, 588-90).[19] In any event, we agree with the Appellate Division that the evidence petitioner complains was not presented was "exceedingly weak," Mathieu, 19 A.D.3d at 219-20, 796 N.Y.S.2d at 523, since it established only the existence of two men who shared some of petitioner's general features but who had not been seen in the area on the date of the crime. Moreover, counsel was successful in introducing evidence about the homeless men and other non-tenants having access to the building around the time of the incident, as well as evidence about other problems with building security. (See Tr. 511-14, 516-17, 521-22, 587, 589). Because the manner and conduct of direct examination, like cross-examination, "is entrusted to the judgment of the lawyer" and will generally not be second-guessed by the courts, Luciano, 158 F.3d at 660, and because we find that counsel's examination of these witnesses was "reasonable considering all the circumstances," Strickland, 466 U.S. at 688, petitioner cannot demonstrate

---

[19] The court likely restricted such testimony because of New York's rule requiring that evidence of third-party guilt "must do more than raise a mere suspicion that another person committed the crime; there must be a clear link between the third party and the crime in question." People v. Primo, 96 N.Y.2d 351, 355, 728 N.Y.S.2d 735, 738 (2001) (emphasis omitted) (citation omitted). As the trial court later noted in its ruling on petitioner's 440.10 motion, Jones and Carter-Cohen "could only have testified that within the general time frame, but not on the date of the crime, they had observed men who shared two relatively common features with defendant, that is, they were black and had dre[a]dlocks." (Respt.'s Ex. M at 4). This testimony would not establish the "clear link" between the homeless men and the crime that would be required for its admission. See, e.g., People v. Schulz, 4 N.Y.3d 521, 528-29, 797 N.Y.S.2d 24, 28-29 (2005).

ineffective assistance on this basis.

Finally, petitioner argues that his counsel erred by not calling Landeo as an alibi witness. This also does not establish ineffective assistance. See, e.g., Greiner, 417 F.3d at 323 (emphasizing that "counsel's decision as to 'whether to call specific witnesses -- even ones that might offer exculpatory evidence -- is ordinarily not viewed as a lapse in professional representation'") (citations omitted); see also United States v. Best, 219 F.3d 192, 201-02 (2d Cir. 2000); Luciano, 158 F.3d at 660. Counsel had several sound tactical reasons for not calling Landeo as a witness. First, counsel found that Landeo "did not hold up well under cross-examination as she tended to be defensive and easily confused." (Respt.'s Ex. K, Kendrick Affirmation, executed Sept. 25, 2003, at ¶ 10). Second, counsel found that Landeo "could not account for [petitioner's] whereabouts during the time the alleged crime was being committed." (Id.). Finally, counsel was concerned that Landeo's testimony could open the door to the introduction of an incriminating statement made by petitioner that had otherwise been excluded. (See Tr. 500-01, 571).[20] Counsel

_____

[20] See also supra note 11. Petitioner is mistaken in asserting that James v. Illinois, 493 U.S. 307 (1990), "does not permit a defense witness to be impeached with a statement made by the defendant." (Reply 23). Rather, James bars the prosecution from using *illegally obtained* statements in a criminal proceeding to impeach the testimony of defense witnesses. 493 U.S. at 320. Defense counsel had received a ruling that the statement at issue

therefore reasonably believed that Landeo's testimony could do more harm than good to petitioner's case, and the decision not to call her as a witness accordingly does not constitute ineffective assistance. See, e.g., United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel.").

In sum, petitioner's ineffective-assistance claim is meritless.

## CONCLUSION

For the reasons stated, we recommend that the writ be denied on the merits and the petition dismissed with prejudice.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, and to the chambers of the undersigned,

---

here had not been illegally obtained (see Hr'g Tr. 88-89, 93), and thus it was not unreasonable for counsel to believe that it could be introduced to impeach Landeo.

Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

**DATED: New York, New York**
**July 11, 2007**

**RESPECTFULLY SUBMITTED,**

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been mailed
this date to:

Camille M. Abate, Esq.
Abate & Preuss
19 Fulton Street
New York, NY 10038

Lisa Fleischmann, Esq.
Assistant Attorney General
     for the State of New York
120 Broadway
New York, NY 10271